UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| NICHOLAS A. GLADU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   2:15-cv-00384-DBH |
| | ) |
| CORRECT CARE SOLUTIONS, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT AND MOTION FOR LEAVE TO REFILE MALPRACTICE CLAIM**

In this § 1983 action, Plaintiff Nicholas Gladu, an inmate at the Maine Correctional Center (MCC), asserts that Defendants Correct Care Solutions (CCS) and two of its providers acted with deliberate indifference toward Plaintiff's serious medical condition.

The matter is before the Court on Plaintiff's Motion for Leave to Amend (ECF No. 157) and Plaintiff's Motion for Leave to Refile Malpractice Claim (ECF No. 161). Following a review of the parties' arguments and the record, I recommend the Court grant in part the motions.[1]

## I. Procedural Background

On May 6, 2016, the Court, upon review of a Recommended Decision dated February 19, 2016, dismissed Plaintiff's state law medical malpractice claim because

---

[1] Although a motion to amend is within the magistrate judge's authority, *Maurice v. State Farm Mut. Auto. Ins. Co.*, 235 F.3d 7, 9 n.2 (1st Cir. 2000), because the motions could be dispositive on certain pending claims, I determined that a recommended decision was appropriate.

Plaintiff failed to comply with the requirements of the Maine Health Security Act, 24 M.R.S. §§ 2853 et seq. (ECF Nos. 87, 127.) Through his motion for leave to refile, Plaintiff seeks to reintroduce the malpractice claim. (Motion to Refile at 1.) Through his motion for leave to file an amended complaint, Plaintiff seeks to add multiple new claims and defendants, and "abandon[] claims as to Defendants Burns and Touchette." (Motion to Amend at 1; Proposed Amended Complaint, ECF No. 157-1.)

## II. PROPOSED AMENDED COMPLAINT

In his proposed amended complaint (ECF No. 157-1), Plaintiff attempts to assert claims against several additional defendants: the Maine Department of Corrections, the Maine Correctional Center, and Susan Carr, Deputy Warden for Programs and Services at the Maine Correctional Center. Plaintiff also attempts to assert the following new claims: (1) disability discrimination claims under the Americans with Disabilities Act, the Rehabilitation Act, and the Maine Human Rights Act; (2) supplemental basis for his retaliation claim; (3) a claim under the Maine Patient's Bill of Rights; and (4) a third-party beneficiary breach of contract claim against the Department of Corrections and CCS.

As alleged, beginning in late 2012, Plaintiff experienced pain in his joints, particularly in his hips. (*Id.* ¶ 18.) In time, Plaintiff also experienced bruising on his hips, and he informed Defendant Clinton, CCS's Medical Director, that he believed the problem was the mattress issued by the Correctional Center. (*Id.* ¶ 23.) Defendant Clinton issued a medical order permitting Plaintiff three additional blankets and another pillow to increase the support provided by the mattress. (*Id.* ¶ 25.) Plaintiff continued to experience pain and bruising, and requested that Defendant Clinton provide a double mattress. In February

2014, Defendant Clinton denied the request, concluding that Plaintiff did not meet the criteria for a double mattress. (*Id.* ¶ 29.) Plaintiff was seen by nursing staff on his continuing requests for medical attention related to hip pain, although generally he was not seen within 48 hours of making his requests. (*Id.* ¶¶ 27 – 36.) On May 12, 2014, Plaintiff was examined by "a medical provider," reported worsening pain symptoms, but received pain medication other than his preferred medication. (*Id.* ¶ 37.)

On June 2, 2014, Sergeant Michael Burns issued a double mattress to Plaintiff. (*Id.* ¶ 40.) Defendant Clinton examined Plaintiff on June 5, and Plaintiff reported improvement with the "double matt." (*Id.* ¶ 41.) Defendant Clinton again determined that Plaintiff did not meet the criteria for a double mattress, and thus advised Plaintiff that he might not retain the double mattress if he was relocated. (*Id.* ¶ 42.)

On June 10, 2014, after CCS ordered x-rays of Plaintiff's hips, a radiology report characterized the images as "unremarkable," but suggested follow up if symptoms persisted. (*Id.* ¶ 45.) When Defendant Clinton saw Plaintiff again on July 10, 2014, Plaintiff reported that he continued to experience "severe pain," and he requested an evaluation by an outside orthopedic specialist. (*Id.* ¶¶ 50 – 51.) Defendant Clinton refused the request for a referral, noting that an outside referral would require evidence of a "loss of function." (*Id.* ¶ 50.)

At some point, Plaintiff was transferred temporarily to the Maine State Prison. Plaintiff maintains that on July 18, 2014, while Plaintiff was at the prison, Sergeant Burns and a corrections officer removed Plaintiff's double mattress and Sergeant Burns deprived

Plaintiff of a bed mattress for seven nights as punishment.[2] (*Id.* ¶¶ 52 – 55.) Plaintiff thus slept for seven nights on a "very thin blanket-like pad." (*Id.* ¶ 62.) Plaintiff filed sick call slips with the hope that CCS would intercede on his behalf, but on July 20, 2014, nursing staff responded that there was nothing they could do to assist Plaintiff. (*Id.* ¶¶ 64 – 65.) On July 26, Plaintiff was provided with a double mattress. (*Id.* ¶ 66.)

Plaintiff returned to the Maine Correctional Center on September 17, 2014. (*Id.* ¶ 70.) Evidently, Plaintiff did not receive a double mattress upon his return to the MCC because on November 8, 2014, he requested that he receive the extra blankets and the pillow originally ordered by Defendant Clinton. (*Id.* ¶¶ 70 – 72.)

On December 16, 2014, a corrections officer provided Plaintiff with an extra mattress. (*Id.* ¶ 73.) Plaintiff's symptoms began to improve with the additional mattress and light exercise. (*Id.* ¶ 74.) On March 2, 2015, Plaintiff was reassigned to new housing, but did not retain the double mattress. (*Id.* ¶ 75.) Plaintiff subsequently submitted a sick-call slip upon experiencing "severe hip pain and difficulty sleeping." (*Id.* ¶ 76.)

On April 6, 2015, upon examination of Plaintiff, Defendant Clinton made positive findings for pain in the trochanteric bursa. Defendant Clinton ordered Prednisone and a referral to another CCS physician, Defendant George Stockwell, D.O. (*Id.* ¶ 78.) Defendant Clinton, however, denied Plaintiff's request for an extra mattress. (*Id.* ¶ 80.)

---

[2] Evidently, Plaintiff was charged with removing thread from his mattress to create a fishing line. (Proposed Am. Compl. ¶ 54.) Plaintiff alleges, however, that the punishment was retaliation for grievance activity related to the assault. (*Id.* ¶ 53.)

Defendant Stockwell examined Plaintiff on April 21, 2015, and diagnosed bilateral trochanteric bursitis. He administered cortisone injections in both hips. (*Id.* ¶¶ 82 – 83.) When Defendant Stockwell examined Plaintiff again on May 1, Plaintiff reported that the injections had not helped. (*Id.* ¶ 87.) At that time, Plaintiff and Defendant Stockwell agreed that Plaintiff had exhausted all "first round" treatment options over the preceding three years, including Ibuprofen, Tylenol, Mobic, Naproxyn, Prednisone, Omega-3 fish oil, Neurontin, and Cortisone injections. (*Id.* ¶ 88.) Plaintiff requested a trial of pain management treatment and an evaluation from an orthopedic surgeon. (*Id.* ¶ 89.) Defendant Stockwell, and later Defendant Wendy Riebe, Health Services Administrator for CCS, denied Plaintiff's requests for pain management treatment and an outside consultation. (*Id.* ¶¶ 90 – 94.)

In June 2015, Plaintiff was beginning to have difficulty walking and was "barely getting three hours of sleep." (*Id.* ¶ 101.) When he saw Defendant Clinton on July 13, 2015, Plaintiff informed Defendant Clinton of his difficulties and also reported experiencing chronic headaches that he attributed to lack of sleep and chronic pain. (*Id.* ¶¶ 112, 114, 115.) Based on this report of symptoms, Defendant Clinton agreed to an outside referral and prescribed Cymbalta. (*Id.* ¶¶ 116, 117.)[3]

As the result of the outside consultation, which occurred on August 3, 2015, the orthopedic specialist diagnosed bilateral trochanteric bursitis. (*Id.* ¶¶ 125, 126.) He

---

[3] According to Plaintiff, he experiences significant relief with Cymbalta, both in relation to his pain and difficulty sleeping. However, Plaintiff also began experiencing intense depression. (*Id.* ¶¶ 119 – 120.)

recommended that Plaintiff receive physical therapy, an additional mattress, and an "egg crate foam bed pad." (*Id.* ¶¶ 127 – 128.)

Defendant Clinton refused to issue the second mattress or the foam pad because Plaintiff did not meet the criteria established by CCS. Defendant Clinton also determined that Plaintiff would be considered for physical therapy if he received a less restrictive housing assignment. (*Id.* ¶¶ 130 – 131.) When Plaintiff filed a grievance, Defendant Riebe upheld the determination and advised Plaintiff to stretch and engage in light exercise. (*Id.* ¶¶ 137 – 139.) Plaintiff contends that Defendant Clinton's refusal to authorize a double mattress is retaliation for Plaintiff's grievance activity and for filing a complaint with the medical board. (*Id.* ¶ 154.)

On October 13, 2015, Plaintiff informed Defendant Riebe that the single mattresses were of poor quality, contrary to the assumption of CCS. Defendant Riebe advised Plaintiff that she would ask Defendant Clinton to reconsider ordering a double mattress for Plaintiff. (*Id.* ¶¶ 169 – 170.) The next day, Defendant Riebe informed Plaintiff that Defendant Clinton "just won't budge." (*Id.* ¶ 171.) Nevertheless, after a meeting with Dr. Clinton on October 20, 2015, Plaintiff received a "brand new" mattress that provided "notable relief" for approximately one month. (*Id.* ¶¶ 180, 182.)

Plaintiff began experiencing severe pain and bruising after a month. He requested a special orthopedic mattress, but was issued "hip guards" that did not provide any relief. (*Id.* ¶¶ 185 – 191.) On January 25, 2016, Defendant Clinton reported that CCS could not authorize a double mattress because it would require CCS to make an exception for Plaintiff, which could impact CCS nationally. (*Id.* ¶ 197.)

On February 17, 2016, Defendant Stockwell examined Plaintiff and recommended prolotherapy injections. (*Id.* ¶ 204.) Plaintiff agreed to the injections, but experienced extreme pain and discomfort for nearly a week. (*Id.* ¶ 206.)

Plaintiff also experienced back pain, which he developed in March 2015. Defendant Stockwell informed Plaintiff that an x-ray revealed degenerative disk disease at L5. (*Id.* ¶ 223.) Defendant Stockwell, however, refused Plaintiff's requests for a desk and chair to perform legal work and a back-support belt to address pain related to his need to lean forward to do legal work while seated on his bunk. (*Id.* ¶ 226.) Defendants also denied Plaintiff's request for an MRI. (*Id.* ¶ 240.)

In May 2016, Plaintiff expressed concern about "constant open sores on the soles of his feet and hair loss on [his] low back and lower legs," which Defendants "seemed to shrug off." (*Id.* ¶ 255.) Plaintiff also reported worsening bruising of his left hip and groin, worsening severe hip pain, and persistent stiffness. (*Id.* ¶¶ 257 – 258.)

Plaintiff asserts that on June 13, 2016, he attempted to take his own life by slicing his throat and jumping over an upper level railing. (*Id.* ¶ 259.) An officer tackled Plaintiff before he could make the jump from the railing and Plaintiff "was only able to slice part of his own neck." (*Id.* ¶ 260.) Plaintiff was then assigned to segregation for approximately 10 days. Plaintiff alleges Defendant Clinton refused to see Plaintiff while he was in segregation. (*Id.* ¶¶ 263.)

On June 29, 2016, Dr. Stockwell informed Plaintiff that he no longer would diagnose Plaintiff with bilateral trochanteric bursitis because Plaintiff's symptoms exceeded that diagnosis. Dr. Stockwell also stated that he was not allowed to approve

7

Plaintiff's requests for a double mattress, MRI, or outside consultation. (*Id.* ¶ 270.) Plaintiff's x-rays were reviewed by an outside consultant and the diagnosis of degenerative disk disease was confirmed. The consultant recommended an MRI, physical therapy, a double mattress, and follow-up with an orthopedic specialist, but Dr. Stockwell informed Plaintiff that CCS would not provide all of the treatments. (*Id.* ¶ 271.)

On July 6, 2016, Defendant Stockwell again recommended prolotherapy, and offered Tramadol to manage the related pain. (*Id.* ¶ 287.) Plaintiff found the injection extremely painful and he experienced significant additional pain when his pain medication order expired five days later. (*Id.* ¶ 289.) Plaintiff refused further prolotherapy. (*Id.* ¶ 291.)

When Plaintiff suggested to Defendant Stockwell that his symptoms were the product of Ankylosing Spondylitis, Defendant Stockwell told Plaintiff that his records did not rule out the diagnosis. (*Id.* ¶¶ 292 – 297.) Plaintiff renewed his requests for, inter alia, MRI and a double mattress, but Dr. Stockwell stated that CCS would not allow it. (*Id.* ¶¶ 297 – 299.)

Plaintiff alleges that CCS has a policy to minimize treatment, prolong diagnoses, deny MRIs, focus on symptoms rather than causes, and understate diagnoses to save money. (*Id.* ¶¶ 301 – 305.) Plaintiff further asserts that CCS has a policy to withhold diagnoses and treatments when they might prove unfavorable to its interest in pending litigation. (*Id.* ¶ 306.)

Plaintiff alleges that Defendants CCS, Riebe, Clinton, and Stockwell acted with deliberate indifference toward his medical needs; that their conduct was the product of the

8

customs and policies of CCS and the Department of Corrections; that CCS, the Department of Corrections, and MCC Deputy Warden Carr approved, authorized, and ratified the conduct; that the Department and Defendant Carr failed to supervise the conduct of CCS; and that CCS failed to satisfy the standard of reasonable care. (*Id.* ¶¶ 307 – 314.)  Plaintiff also alleges Defendant Riebe retaliated against him for his complaints about CCS's failure to provide appropriate care by writing him up for making false statements.  (*Id.* ¶¶ 276 – 279.)

### III. DISCUSSION

Rule 15(a)(1) of the Federal Rules of Civil Procedure permits a litigant to amend a pleading "as a matter of course" subject to certain time constraints.  When a party seeks to amend a complaint more than 21 days after the filing of a responsive pleading, the other party's consent or leave of court is required in order to amend the complaint.  Fed. R. Civ. P. 15(a)(2).  In such a case, the court is to grant leave to amend "freely" when "justice so requires."  *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").

**A.     Plaintiff's Motion for Leave to Refile Malpractice Claim (ECF No. 161)**

On May 6, 2016, the Court dismissed without prejudice Plaintiff's state law medical malpractice claim because Plaintiff failed to comply with the requirements of the Maine Health Security Act, 24 M.R.S. §§ 2853 et seq., which requirements include the need to

conclude the prelitigation screening process before filing an action in court. Plaintiff maintains that he should be permitted to refile the malpractice action because the prelitigation screening process has concluded. (Motion for Leave to Refile at 1, ECF No. 161.)

Plaintiff attached to his motion the July 27, 2016, order of the prelitigation screening panel chair, granting Plaintiff's motion for default against CCS based on CCS's failure to respond to show cause as to why it did not file timely a response to Plaintiff's notice of claim in state court. The panel chair explained in her order that, because of the default by CCS, "[t]he case moves to Superior Court without the merits of the claims against this Respondent having been evaluated by a panel." (ECF No. 161-1.) The panel chair's order is silent regarding Plaintiff's malpractice claims against Defendants Clinton, Riebe, and Stockwell.

Defendants do not oppose Plaintiff's request to refile the malpractice claim against CCS, but object to any attempt by Plaintiff to assert malpractice claims against Defendants Clinton, Riebe, and Stockwell because "said claims were never before the panel." (Defendants' Response at 1, ECF No. 177.) Defendants maintain that Plaintiff waived any claims against said Defendants. (*Id.* at 3 & Exs. A – D.)

Plaintiff cannot proceed on his state law medical malpractice claim unless the state court medical malpractice screening panel proceedings are complete. 24 M.R.S. § 2903(1); *see Henderson v. Laser Spine Inst.*, 815 F. Supp. 2d 353, 381 (D. Me. 2011); *Kidder v. Richmond Area Health Ctr.*, 595 F. Supp. 2d 139, 143 (D. Me. 2009). The panel chair's order entering default and authorizing the matter to proceed in court references only one

respondent – CCS. The order is consistent with the panel chair's March 25, 2016, letter to Plaintiff and defense counsel, in which she summarized a conference call with the parties, and wrote: "With the exception of the Motion for Default …, all outstanding issues pending from Claimant in this matter are either waived or withdrawn." (*Id.*, Ex. D, ECF No. 177-4.) The record thus establishes that Plaintiff did not pursue to conclusion before the prelitigation screening panel the medical malpractice claims against the individual providers. Accordingly, while Plaintiff can reassert the malpractice claim against CCS, he cannot assert the claim against the individual providers (i.e., Defendants Clinton, Riebe, and Stockwell).

**B.      Plaintiff's Motion to Amend to Introduce New Claims and Defendants, and to Dismiss Certain Defendants (ECF No. 157)**

Plaintiff's complaint consists of Fourteenth Amendment claims of deliberate indifference toward serious medical needs and retaliation for petitioning government to address Plaintiff's grievances. (Complaint, ECF No. 1, at 1.) Pursuant to 42 U.S.C. § 1983, Plaintiff asserts the claims against Defendants CCS, Dr. Robert Clinton, Dr. George Stockwell, Wendy Riebe, Michael Burns, and Timothy Touchette.

Through his motion to amend, Plaintiff seeks to abandon his claims against Defendants Burns and Touchette, both of whom are or were members of the corrections staff, in order to focus on his claims regarding the medical care he received. (ECF No. 157 at 1.) Plaintiff also requests leave to assert new claims against the medical providers under the Americans with Disabilities Act, the Rehabilitation Act, the Maine Patient's Bill of Rights, the Maine Human Rights Act, and the Maine Civil Rights Act. Additionally,

11

Plaintiff requests leave to assert a breach of contract/corporate liability claim against CCS, and to expand his retaliation claim. (*Id.*) Defendants oppose the motion based on the futility and timeliness of the motion.

Defendants' timeliness argument is not persuasive. The Court granted Plaintiff until July 29, 2016, to file a motion to amend (see ECF No. 147), and the Plaintiff filed his motion on July 29. Under the circumstances, therefore, the amendment is not precluded based on the timing of the motion. The issue is whether the requested amendment would be futile.

"In assessing futility, the district court must apply the standard which applies to motions to dismiss under Fed. R. Civ. P. 12(b)(6)." *Adorno v. Crowley Towing & Transp. Co.*, 443 F.3d 122, 126 (1st Cir. 2006). Accordingly, the Court must accept as true all well-pleaded facts and draw all reasonable inferences in favor of Plaintiff to determine whether Plaintiff has stated a claim for which relief may be granted. *Morgan v. Town of Lexington, MA*, 823 F.3d 737, 742 (1st Cir. 2016). A complaint fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "The relevant question ... in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.'" *Rodríguez–Reyes v. Molina–Rodríguez,* 711 F.3d 49, 55 (1st Cir. 2013) (quoting *Twombly,* 550 U.S. at 569 n. 14).

### *1. The ADA and the Rehabilitation Act*

Plaintiff alleges the Department of Corrections and CCS[4] failed to accommodate his disability, and denied him access to programs and services, in violation of Titles II and III of the ADA and § 504 of the Rehabilitation Act. Plaintiff asserts the Title II claim against the Department of Corrections, asserts the Title III claim against CCS, and asserts the Rehabilitation Act claim against both the Department and CCS. Plaintiff does not assert the claims against the individual defendants.[5] (Proposed Am. Compl. at 60.)

The ADA and Rehabilitation Act "provide, in nearly identical language, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014).[6] Medical care in prison falls within the coverage of the ADA and the Rehabilitation Act. *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d

---

[4] Plaintiff's attempt to join the Maine Correctional Center as a defendant fails. The MCC is a state facility operated by the Department of Corrections. 34-A M.R.S. § 3001, 3401-3407.

[5] Although Plaintiff has not asserted the claims against any individual defendant, Defendants argue that federal courts have not authorized ADA and Rehabilitation Act claims against individuals. Although the Court need not address the argument, Defendants' argument appears to have merit. *See*, *e.g.*, *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007); *Miller v. King,* 384 F.3d 1248, 1277 (11th Cir. 2004); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); *Wiesman v. Hill*, 629 F. Supp. 2d 106, 112 (D. Mass. 2009); *Jordan v. Delaware,* 433 F.Supp.2d 433, 442 (D. Del. 2006); *see also Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 290 (1st Cir. 2006) (collecting cases, withholding resolving the issue).

[6] Title II prohibits such conduct by public entities. 42 U.S.C. § 12132. Title III prohibits discrimination in places of public accommodation. 42 U.S.C. § 12182(a). Section 504 of the Rehabilitation Act prohibits discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

13

274, 284 (1st Cir. 2006) (citing *United States v. Georgia*, 546 U.S. 151, 157 (2006)).[7] Disability discrimination can consist of (a) the imposition of adverse consequences on a prisoner based on the prisoner's disability, (b) a prison policy that is neutral in its terms, but impacts prisoners with a disability more significantly, or (c) the refusal by the prison administrators to grant the prisoner a reasonable accommodation so that the prisoner can have meaningful access to a prison program or service. *Id.*

Mere allegations of medical negligence, however, are not sufficient to state a disability discrimination claim. *Kiman*, 451 F.3d at 284 (citing *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("a plaintiff's showing of medical unreasonableness [under the Rehabilitation Act] must be framed within some larger theory of disability discrimination")). "When the decision being challenged is 'simply a reasoned medical judgment with which the patient disagreed,' it is more appropriate for the patient to turn to 'state medical malpractice law, not [the ADA].'" *Id.* at 285 (quoting *Lesley,* 250 F.3d at 58).

To state a claim, a plaintiff must provide a short and plain statement that identifies the disability and the relationship between the disability and the policy or practice on which the discrimination claim is based. *See*, *e.g.*, *Toledo v. Sanchez*, 454 F.3d 24, 31 (1st Cir. 2006) ("To state a claim for a violation of Title II [of the ADA], a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from

---

[7] The Supreme Court has observed that "[m]odern prisons provide inmates with many recreational activities, medical services, and educational and vocational programs, all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be excluded from participation in)." *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (some internal quotation marks omitted).

participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability.").

Plaintiff alleges that he suffers a disability that produces symptoms including severe pain in his hips, and that he requires an improved mattress or a second mattress in order to reduce his symptoms. Plaintiff maintains that the requested accommodation (i.e., the second mattress) would substantially reduce his pain, greatly improve his sleep, mental health, and ability to walk, and enable him to participate in various programs and services. Viewed in the light most favorable to Plaintiff, Plaintiff has alleged the existence of a neutral policy regarding the availability of certain mattresses, which policy impacts Plaintiff more significantly due to his disability. Plaintiff's disability claims thus would not be futile.[8]

As a private entity, however, Defendant CCS, cannot be liable for disability discrimination under Title II of the ADA. *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010); *Lee v. Corr. Corp. of Am./Corr. Treatment Facility*, 61 F. Supp. 3d 139, 143 (D.D.C. 2014); *Goodman v. The Robert A. Deyton Det. Facility*, No. 1:15-CV-1724, 2015 WL 5480046, at *4 (N.D. Ga. Sept. 15, 2015), *appeal dismissed* (Dec. 8, 2015) (involving federal detention center run by a private corporation). Accordingly, leave to amend to

---

[8] Contrary to Defendants' argument, Plaintiff's disability claims are not limited to allegations that Defendants engaged in medical negligence thereby denying him participation in proper medical treatment. (Defendants' Opposition at 7 – 8.) Plaintiff has alleged deliberate indifference as a subjective state of mind. Additionally, Plaintiff has alleged that Defendants enforce a strict policy that falls more harshly on him due to his disability, and that a reasonable accommodation would enable his participation in various activities other than medical treatment.

assert the Title II claim against CCS would be futile. Plaintiff has alleged an actionable claim against CCS under Title III and the Rehabilitation Act.[9]

### 2. *Maine Human Rights Act and Maine Civil Rights Act*

To the extent Plaintiff has stated federal claims actionable under 42 U.S.C. § 1983, the ADA and the Rehabilitation Act, he has also stated state law claims under the Maine Human Rights Act and the Maine Civil Rights Act. *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA."); *Scott v. Androscoggin Cty. Jail*, 2004 ME 143, ¶¶ 20, 31, 866 A.2d 88, 94, 96–97 (disability claim under the MHRA analyzed according to ADA precedent).

### 3. *Maine Patient's Bill of Rights*[10]

Plaintiff asserts a claim against CCS and the Department of Corrections under 24-A M.R.S. § 4313. The statute, referred to as part of the Health Plan Improvement Act, provides:

> A carrier has the duty to exercise ordinary care when making health care treatment decisions that affect the quality of the diagnosis, care or treatment provided to an enrollee and is liable for damages as provided in this section

---

[9] Defendant CCS has not addressed whether it is a proper defendant under ADA Title III or the Rehabilitation Act. With respect to the Rehabilitation Act, Plaintiff alleges on information and belief that CCS is a recipient of federal funding. (ECF No. 157-1, PageID # 744, ¶ 5.) For present purposes, Plaintiff's allegation is accepted as true. However, the mere fact that CCS receives compensation from the State of Maine in exchange for its services does not make it a recipient of "federal financial assistance" even if the State receives federal financial assistance earmarked to the operation of its prison system. *Lee*, 61 F. Supp. 3d at 144; *Goodman*, 2015 WL 5480046, at *4. With respect to Title III, its coverage extends to "public accommodations provided by private entities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999). "[W]hether a private provider of jail medical facilities [and] services can face scrutiny under Title III of the Americans with Disabilities Act does appear to be novel." *Hernandez v. Cty. of Monterey*, 70 F. Supp. 3d 963, 967 (N.D. Cal. 2014) (concluding that Title III coverage exists in this context). As this legal issue is not briefed, whether a prison is a place of public accommodation is not addressed.

[10] *See* P.L. 1999, ch. 742, § 19 ("An Act to Establish a Patient's Bill of Rights").

>for harm to an enrollee proximately caused by the failure of the carrier or its agents to exercise such ordinary care.

24–A M.R.S. § 4313(1)(A). "[A] carrier can be liable under section 4313 only if it denied coverage for skilled care that was covered by the health care plan." *Gallagher v. Cigna Healthcare of Maine, Inc.*, 538 F. Supp. 2d 286, 293 (D. Me. 2008).

Plaintiff alleges that the Department is a "carrier," that CCS is its agent, and that he is enrolled in a "managed care plan." (Proposed Am. Compl. at 64.) Plaintiff's allegations are entirely conclusory. In particular, Plaintiff has not alleged facts demonstrating that the Department of Corrections is a carrier, as that term is defined in the Act, 24-A M.R.S. § 4301-A. Plaintiff has also failed to identify the plan or any provision in such plan that covered the relevant treatment. An amendment to assert a claim under the statute would thus be futile.

### *4. Breach of Contract*

Plaintiff alleges that he is an intended beneficiary of the medical services contract between the Department of Corrections and CCS, and that CCS is liable to him for breach of that contract. (Proposed Am. Compl. at 61.) "Third parties to contracts are strictly limited in their ability to maintain an action under contract law. A third party harmed by a breach may only sue for breach of contract if the contracting parties intended that the third party have an enforceable right." *Stull v. First Am. Title Ins. Co.,* 2000 ME 21, ¶ 17, 745 A.2d 975, 981. Although Plaintiff has not included the contract as part of the proposed amended complaint, Plaintiff has alleged that prisoners are the intended beneficiaries of the contract because the contract exists in part to ensure that any constitutional duty the

17

Department of Corrections owes to an inmate regarding medical care will be provided by CCS. At this stage of the proceedings, without the benefit of a more extensive record, the amendment to assert the breach of contract claim cannot be considered futile.

## C. Voluntary Dismissal of Defendants Burns and Touchette

Plaintiff has expressed his intention to forego his claims against Defendants Burns and Touchette. In the absence of any objection, dismissal of Defendants Burns and Touchette is appropriate. *Pedroza v. Lomas Auto Mall, Inc.*, 304 F.R.D. 307, 323 (D.N.M. 2014) (citing support for the conclusion that dismissal of "an action" under Rule 41(a) includes dismissal of "all claims asserted against a single defendant"); *Transwitch Corp. v. Galazar Networks, Inc.*, 377 F. Supp. 2d 284, 289 (D. Mass. 2005) (discussing magistrate judge authority under Rule 15 to dismiss some but not all claims against a defendant, without addressing dismissal of all claims against a particular defendant).

## IV. CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part Plaintiff's Motion for Leave to Amend (ECF No. 157). In particular, I recommend the Court permit Plaintiff to join as parties the Department of Corrections and Deputy Warden Carr, and that the Court permit Plaintiff to proceed on the claims asserted in the proposed amended complaint (ECF No. 157-1), except for the claim under the Maine Patient's Bill of Rights and the Title II claim against CCS.

I also recommend the Court grant in part Plaintiff's Motion for Leave to Refile Malpractice Claim (ECF No. 161). Specifically, I recommend the Court permit Plaintiff

to refile the medical malpractice claim against CCS, but not permit Plaintiff to assert a medical malpractice claim against Defendants Clinton, Riebe, and Stockwell.

Finally, I recommend the Court dismiss Plaintiff's claims against Defendants Burns and Touchette.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 2nd day of November, 2016