UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NICHOLAS A. GLADU,                )
                                  )
                Plaintiff         )
                                  )
        v.                        )        2:15-cv-00384-JAW
                                  )
CORRECT CARE SOLUTIONS,           )
et al.,                           )
                                  )
                Defendants        )


**RECOMMENDED DECISION ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND ORDER ON
PLAINTIFF'S RECORD-RELATED MOTIONS**

In this action, Plaintiff Nicholas Gladu alleges that Defendants have acted with deliberate indifference to his serious medical needs, discriminated against him on the basis of disability, retaliated against him for engaging in conduct protected under the First Amendment, and breached duties owed to him under Maine law.

The matter is before the Court on Defendants' motions for summary judgment. (Motion for Summary Judgment of Defendants Maine Department of Corrections and Susan Carr, ECF No. 261; Motion for Summary Judgment of Defendants Correct Care Solutions, Robert Clinton, M.D., George Stockwell, D.O., and Wendy Riebe, ECF No. 266.) In addition, the matter is before the Court on Plaintiff's Motion for the Court to Take Judicial Notice (ECF No. 369); Motion to Strike the Supplemental Declaration of Robert Clinton, M.D. (ECF No. 376); Motion for Consideration of New Evidence (ECF No. 462);

Motion to Add New Evidence to the Record (ECF No. 463); and Motion for Judicial Notice (ECF No. 471).

Following a review of the record and after consideration of the parties' arguments, I grant Plaintiff's motions requesting the consideration of certain evidence, deny Plaintiff's motions for judicial notice and motion to strike, and recommend the Court grant Defendants' motions for summary judgment.

## PLAINTIFF'S RECORD-RELATED MOTIONS

### 1.    Plaintiff's Motion to Strike the Supplemental Declaration of Dr. Clinton

In response to the declaration Plaintiff filed in connection with the summary judgment motion, Defendant Correct Care Solutions (CCS) filed a supplemental declaration of Dr. Clinton. (ECF No. 357-1.) Plaintiff, challenging certain assertions in the declaration, asks the Court to strike the declaration. The record reflects that regardless of the merit of the assertions made in the declaration, CCS reasonably sought to address through the declaration certain issues raised by Plaintiff in his response to the summary judgment filing. Furthermore, through his filings, Plaintiff has addressed his objections to Dr. Clinton's assertions. The information included in the declaration and in Plaintiff's response is relevant to the summary judgment issues. Plaintiff's motion to strike, therefore, is denied. The information included in the declaration and in Plaintiff's response will be considered as part of the summary judgment record.

### 2.    Plaintiff's Motions for the Court to Take Judicial Notice

Plaintiff moves the Court, as part of the summary judgment analysis, to take notice of two medical treatises he cites in support of his claims. (ECF No. 369.) In addition,

Plaintiff requests that the Court take notice that certain of Plaintiff's symptoms are symptoms that persons with Cushing Syndrome experience. (ECF No. 471.)

Federal Rule of Evidence 201(b) provides that the Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known or within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Plaintiff has not identified any specific facts of which he asks the Court to take judicial notice. Instead, Plaintiff evidently asks the Court to take judicial notice of the entire treatises. Plaintiff has not established that either treatise, or any of the content of the treatises, constitutes a fact for which the Court should take judicial notice in accordance with Evidence Rule 201(b).

In addition, Plaintiff asks the Court to take notice that Plaintiff suffers from certain symptoms and that the symptoms are experienced by a person with Cushing Syndrome. In support of his request, Plaintiff asserts he relies upon information contained in a medical book entitled *Current Medical Diagnosis and Treatment* (2015). On this record, at least some of the symptoms experienced by Plaintiff are subject to reasonable dispute. In addition, Plaintiff in essence asks the Court, by judicial notice, to determine that Plaintiff in fact suffers from a certain condition. Plaintiff's diagnosis is the subject of medical opinion and is not a fact that is "not subject to reasonable dispute" as contemplated by Federal Rule of Evidence 201.

### 3.  Plaintiff's Motions Requesting Consideration of Additional Evidence

Plaintiff moves for the consideration of supplemental evidence. Specifically, Plaintiff asks the Court to consider his sworn statement (a) that following his request in October 2017 to commence physical therapy, Defendants have not provided Plaintiff with physical therapy (ECF No. 462) and (b) that a laboratory report of blood work from November 2009 reflects that Plaintiff's glucose and testosterone levels were high at the time. (ECF No. 463.)  Although Plaintiff filed the evidence after the close of the summary judgment briefing schedule, the evidence will be considered as part of the summary judgment record.

### SUMMARY JUDGMENT FACTS

### 1.  Summary Judgment Statement of the Correct Care Solutions Defendants

The following facts introduced by the Correct Care Solutions Defendants (CCS Defendants),[1] through their summary judgment statement of material facts, are supported by record citation.  (ECF No. 267.)  Plaintiff has filed a "statement of disputed factual issues," through which statement Plaintiff denies or qualifies many of the statements offered by the CCS Defendants.  (ECF No. 342.)  Plaintiff, however, did not support his qualifications and denials with record citations.

Dr. Clinton serves as the Regional Medical Director for CCS, which provides health care services to inmates within the State of Maine's correctional facilities, including the

---

[1] The CCS Defendants consist of Defendants Correct Care Solutions, Robert Clinton, George Stockwell, and Wendy Riebe.

Maine State Prison and the MCC. (ECF No. 267, ¶ 1.) As the Regional Medical Director, Dr. Clinton generally oversees the medical care provided to inmates and he also provides some direct care to patients, including Plaintiff. (*Id.* ¶ 2.) Dr. Clinton has been involved in Plaintiff's health care treatment since 2013. (*Id.* ¶ 3.)

Defendant George Stockwell, D.O., is a board certified osteopathic physician, who works as an urgent care physician at Mercy Express Care in Windham, Maine, a position he has held for nearly 8 years. (*Id.* ¶ 4.) Dr. Stockwell has also worked as a contract physician for CCS, and in that capacity has provided health care services to inmates at the MCC. (*Id.* ¶ 5.) In this role, Dr. Stockwell provided care and treatment to Plaintiff. (*Id.* ¶ 6.)

Defendant Wendy Riebe is a licensed registered nurse, who serves as the Health Services Administrator (HSA) for CCS, a position she has held for three years. (*Id.* ¶ 7.) As the HSA, Ms. Riebe coordinates and monitors the implementation of health care services, including mental health, at the MCC, oversees health care staff at MCC, maintains administrative and fiscal functions of the MCC health care unit consistent with the CCS contract with the Maine Department of Corrections, including budgeting matters, and responds to patient complaints regarding the health care provided by CCS. (*Id.* ¶ 8.) Although Ms. Riebe does not provide direct patient care, she is responsible for the delivery of health care services to patients at the MCC. (*Id.* ¶ 9.)

Plaintiff believes he is suffering from an undiagnosed but serious underlying medical condition that he asserts is causing him chronic and often severe physical pain in his hips and lower back and at times in various other joints. (*Id.* ¶ 10.) Plaintiff reports

sores on his legs and feet, dry and itchy skin on the soles of his feet and various spots of hair loss on his legs and lower back; he believes the conditions reflect a serious health condition. (*Id.* ¶ 11.)

Plaintiff suffers from bilateral trochanteric bursitis which causes him hip pain, and for which Dr. Clinton, Dr. Stockwell and other members of the medical staff have provided treatment, including a trial of pain relievers, exercises, prolotherapy injections, topical cream, and special medical shoes; they have also encouraged Plaintiff to participate in yoga to alleviate the physical discomfort of which he complains. (*Id.* ¶ 12.)

According to Defendants, although Plaintiff reports that he is in pain as the result of the conditions about which he complains, the reported condition does not affect his level of function. (*Id.* ¶ 13.) Plaintiff functions normally within the correctional environment, has a normal gait, walks without a limp and at a brisk rate of speed, participates in recreational activities including softball and yoga, is able to move about the examination room easily, and presents no objective evidence that he is physically limited in any way. (*Id.* ¶ 14.) Dr. Clinton asserts that serious musculoskeletal or rheumatic medical conditions involve signs and symptoms that correlate with a patient's function. (*Id.* ¶ 15.)

CCS provides a multidisciplinary approach to Plaintiff's treatment. The approach involves treatment by physicians, psychiatrists, nurse practitioners, behavioral health specialists, and mental health care providers. (*Id.* ¶ 16.) The treatment team meets on an as needed basis, including with representatives from the correctional staff, to discuss the treatment. (*Id.* ¶ 17.) In addition, the medical department has weekly provider calls, which include psychiatry, and Plaintiff is one of the patients about whom the department speaks

regularly in order to provide him with consistent and appropriate care. (*Id.* ¶ 18.) Occasionally, the team meets with Plaintiff to discuss the medical plan and to address his questions and concerns. (*Id.* ¶ 17.) The assessments of the multidisciplinary team support the plan of care the health care team is providing to Plaintiff. (*Id.* ¶ 19.)

Dr. Clinton and Dr. Stockwell have explained to Plaintiff extensively the reasons for the treatment decisions. (*Id.* ¶ 20.) According to Dr. Clinton, throughout the course of Plaintiff's treatment, there has been no clinical evidence of cancer, an autoimmune disease, or a serious underlying medical condition that would be responsible for Plaintiff's subjective symptoms. Rather, his symptoms are consistent with trochanteric bursitis in his hips, folliculitis on his arms, dry and itchy feet, and occasionally athlete's foot. (*Id.* ¶ 22.)

Dr. Stockwell first saw Plaintiff on April 21, 2015. At that time, Plaintiff was considering injections to both greater trochanteric areas as a way to alleviate his pain, which was a therapy he had discussed with Dr. Clinton. (*Id.* ¶ 23.) Dr. Stockwell injected both hips with triamcinolone and lidocaine, which treatment provided Plaintiff with an immediate reduction in pain. Dr. Stockwell prescribed a 3-day course of ibuprofen to support that relief. (*Id.* ¶ 24.)

On July 13, 2015, Plaintiff reported that he could not sleep because of pain, and he asked if he could be given an extra mattress. (*Id.* ¶ 28.) Pursuant to CCS protocol, a double mattress will be provided when a patient is in the second trimester of pregnancy or later, suffers from active skin ulcerations, suffers from acute congestive heart failure exacerbation or acute deep vein thrombosis. (*Id.* ¶ 26.) On occasion, a patient's condition might warrant a short term prescription for a double mattress; for example, when a patient

is recovering from hip surgery. (*Id.* ¶ 27.) Although Plaintiff did not meet the criteria for a double mattress, Dr. Clinton discussed with the nurse practitioner that it might be medically necessary to prescribe one for him if the extra blanket and pillow previously prescribed were not effective in allowing Plaintiff to sleep. (*Id.* ¶ 29.)

To assess Plaintiff's ability to sleep, Dr. Clinton asked the Department of Corrections to perform a sleep log to document Plaintiff's sleeping pattern. (*Id.* ¶ 30.) On July 25, 2015, Dr. Clinton met with the unit manager, case manager, and Plaintiff to discuss the results of the sleep log which documented that Plaintiff was observed to be sleeping through the night on the nights assessed. (*Id.* ¶ 33.) Dr. Clinton explained that in order to provide Plaintiff with a double mattress, he needed to see a correlation between the observed level of function and Plaintiff's reported inability to sleep. (*Id.* ¶ 34.) Because Dr. Clinton did not find a correlation, Dr. Clinton determined that a double mattress was not medically necessary. [2] (*Id.* ¶ 35.)

Plaintiff was referred for an orthopedic consult to determine whether he was a candidate for iliotibial band surgery based on his complaints of hip pain. (*Id.* ¶ 31.) After examining Plaintiff in August 2015, Dr. Wayne Piers diagnosed Plaintiff with trochanteric bursitis, and concluded there was no need for surgery. He recommended a double mattress and an egg crate mattress, and physical therapy. He also suggested that an MRI might be warranted at some future date based on Plaintiff's condition. (*Id.* ¶ 39.)

---

[2] According to Dr. Clinton, while it may seem like a simple request, a double mattress presents certain correctional concerns. For example, two mattresses may be used to hide contraband. Therefore, the medical staff does not routinely prescribe a double mattress at the request of a patient unless it determines that double mattresses are medically necessary. (ECF No. 267, ¶ 36.)

Because Dr. Piers recommended a double mattress and an egg crate mattress, Dr. Clinton contacted him to discuss whether the recommended treatment was medically necessary. (*Id.* ¶ 40.) Dr. Piers explained to Dr. Clinton that a double mattress or egg crate was not medically necessary to treat Plaintiff's condition, but that Plaintiff had raised the issue and requested the items. (*Id.* ¶ 41.)

At the medical clinic on August 17, 2015, Dr. Clinton discussed with Plaintiff the conversation with Dr. Piers. (*Id.* ¶ 42.) Dr. Clinton informed Plaintiff that the medical staff would continue to monitor his function and make treatment decisions based on the relationship between their observations and his reports of symptoms. Dr. Clinton also reviewed with Plaintiff his sleep log, which reflected that he sleeps through the night. (*Id.* ¶ 43.) During the clinic visit, Dr. Clinton observed Plaintiff demonstrate excellent function when he got up from his chair and walked in the exam room. (*Id.* ¶ 44.) Dr. Clinton advised Plaintiff that he would be referred to physical therapy after he was released from one of the secure housing units. Plaintiff agreed with the plan. (*Id.* ¶ 45.)

On September 29, 2015, Dr. Clinton met with Plaintiff and the nurse practitioner to discuss several issues. Plaintiff reported that he had noticed some improvement in his pain since starting the new medication and, although he believed that pain affected his ability to function, he reported that he was able to participate in indoor and outdoor recreation. (*Id.* ¶ 46.) Plaintiff asked that the providers inspect his mattress, which he felt was substandard. Dr. Clinton recommended that he contact the Department of Corrections to evaluate his mattress if he felt it was substandard. Plaintiff requested an MRI. Dr. Clinton advised Plaintiff that an MRI was not indicated as his function was normal. (*Id.* ¶ 48.) Dr. Clinton

ordered an x-ray of Plaintiff's left hip, the results of which were normal. (*Id.* ¶ 49.) Plaintiff was offered physical therapy at the Maine State Prison in October 2015, which he refused.[3] (*Id.* ¶ 50.) The decision to send Plaintiff to physical therapy at Maine State Prison rather than at a private facility is based on security concerns and is a decision that is not made by the medical department. (*Id.* ¶¶ 51 − 52.) Dr. Stockwell has provided Plaintiff with exercises to perform and Plaintiff also participates in yoga as a means to help treat his complaints of hip pain. (*Id.* ¶ 53.)

At a clinic visit on or about October 20, 2015, Dr. Clinton explained to Plaintiff that his hip x-rays were normal. Plaintiff again requested an MRI of his right hip. (*Id.* ¶ 54.) Dr. Clinton advised Plaintiff that given his level of function, an MRI was not necessary. (*Id.* ¶ 55.) Dr. Clinton and Plaintiff also discussed the fact that Plaintiff was on a list for a new mattress, and Dr. Clinton recommended that he place an extra blanket under his hip for extra cushioning. (*Id.* ¶ 56.) At the next clinic visit on November 9, 2015, Plaintiff reported improvement in his condition. He reported that his medical issues were being addressed satisfactorily and appropriately. (*Id.* ¶ 57.)

On or about January 11, 2016, Dr. Clinton ordered new medical shoes for Plaintiff because the shoes issued by the Department of Corrections had not relieved his pain. Dr.

---

[3] The Department of Corrections has physical therapy on site at the Maine State Prison, which provides a more secure environment and reduces the need for multiple transports. (*Id.* ¶ 51.) In a motion the Court received on November 2, 2017, Plaintiff moved the Court to consider evidence that he requested physical therapy in October 2017 and it was not provided. While the Court grants herein Plaintiff's request for consideration of the evidence, the evidence of the alleged denial of physical therapy in 2017 does not raise a genuine issue for trial on Plaintiff's claims advanced in this action. That is, on this record, whether physically therapy was offered and rejected or not offered is not material to the pertinent summary judgment issues.

Clinton and Plaintiff discussed that medical shoes would be discontinued if/when his trochanteric pain resolved. (*Id.* ¶ 58.)

On February 17, 2016, Plaintiff reported to Dr. Stockwell complaints of hip, groin, and low back pain. Dr. Stockwell examined Plaintiff, reviewed x-rays, and assessed Plaintiff with bilateral greater trochanteric bursitis or more likely bursosis, left groin pain that was likely a muscular strain, back pain, and a dissatisfaction with his medical care. (*Id.* ¶ 60.) Dr. Stockwell discussed with Plaintiff a trial of prolotherapy. After reviewing materials provided by Dr. Stockwell, Plaintiff decided to proceed with the therapy. Dr. Stockwell subsequently injected both greater trochanteric areas with a dextrose 50% and lidocaine mix. (*Id.* ¶¶ 62 – 63.)

When he next met with Plaintiff on March 9, 2016, Dr. Stockwell spent nearly an hour with him discussing his medical condition and answering his questions about his complaints and treatment. (*Id.* ¶ 68.) Plaintiff declined to proceed with further prolotherapy unless he could have an extra mattress or pain medications as the injection had caused him too much pain. He complained of bruising on his hips and attributed his pain to the lack of a supportive mattress. He also complained of low back pain and requested a back brace. (*Id.* ¶ 69.) Plaintiff reiterated his request for an MRI because he believed that the medical department was missing something. He was concerned that he could have cancer and that the medical providers would not discover the source of his pain until it was too late to treat the condition. Dr. Stockwell explained that he did not see a medical necessity for an MRI. (*Id.* ¶ 70.) Dr. Stockwell ordered an HLA B-27 given

Plaintiff's history of irritable bowel disease, because of the possibility that ankylosing spondylitis could be the source of his inflammatory bursitis and pain. (*Id.* ¶ 71.)

At the April 14, 2016, multi-disciplinary team meeting, Plaintiff informed the CCS medical department and the Department of Corrections administrative staff that he did not trust that medical would pursue additional testing if he developed symptoms of a significant underlying medical condition. (*Id.* ¶ 72.) On May 18, 2016, Plaintiff told Dr. Clinton that his hip pain was satisfactorily controlled with the medicine, but that he could still have aggravating pain that prevented him from doing yoga exercises. (*Id.* ¶ 75.) Plaintiff asked about a topical cream advertised on television. Dr. Clinton told Plaintiff that he would prescribe it and advised Plaintiff of the need for consistent use. (*Id.* ¶ 76.) Dr. Clinton also informed Plaintiff a recent blood test confirmed that Plaintiff did not suffer from Lupus. (*Id.* ¶ 77.) Plaintiff reported that he felt well enough to play softball, but was concerned about being on the field due to side effects from his medications which were causing some balance issues when he needed to run. (*Id.* ¶ 78.)

At a medical visit on June 29, 2016, Plaintiff and Dr. Stockwell discussed several of Plaintiff's concerns. Plaintiff explained that he wanted to make sure the medical department did not missing something. (*Id.* ¶ 79.) Dr. Stockwell told Plaintiff that he had spoken to Dr. Piers, who had reviewed the x-ray films, both past and recent, of Plaintiff's hip/pelvis and spine, and that Dr. Piers did not detect anything to suggest the presence of a progressive destructive condition and did not find evidence of osteonecrosis. (*Id.* ¶ 80.) Dr. Stockwell advised Plaintiff that at this time he did not feel that an MRI was medically necessary. (*Id.* ¶ 81.) After some discussion, Plaintiff agreed to proceed with prolotherapy

injections. When he was seen on July 13, 2016, Plaintiff decided to forego further prolotherapy because of the pain. Plaintiff advised Dr. Stockwell that he intended to pursue board and legal complaints to clarify and receive a definitive diagnosis. (*Id.* ¶ 89.)

Dr. Stockwell last met with Plaintiff on August 12, 2016. At that time, Plaintiff reported a flare up of his hip pain. Dr. Stockwell provided him with a seven-day prescription of Tramadol for pain relief. (*Id.* ¶ 90.) Dr. Stockwell's examination of Plaintiff revealed no neurologic deficits and upon rotation, the hip joint was normal.

Plaintiff researches various physical conditions, which he discusses with his medical providers. (*Id.* ¶ 92.) In September 2016, Plaintiff told psychiatry that his "biggest fear" is having a terrible disease that is not diagnosed "until it's too late." The psychiatry consults document that Plaintiff's "obsessive preoccupation with health" is not a new concern, but is a chronic concern. (*Id.* ¶ 93.)

In her role as the Health Services Administrator, Defendant Riebe periodically reviews and analyzes health care records regarding the treatment of patients, and meets with patients to address any concerns and grievances they have regarding their health care. (*Id.* ¶ 114.) All grievances filed by inmates are handled through the Maine Department of Corrections' (MDOC) grievance process and in compliance with MDOC policies and procedures. (*Id.* ¶ 115.) The Department of Corrections has a grievance policy (Policy 29.1) that governs prisoner grievances arising from the conditions of confinement. The Department has a separate policy (Policy 29.2) to govern grievances regarding medical care. The grievance policies were in effect during Plaintiff's incarceration. (*Id.* ¶ 116.)

The grievance policy allows a prisoner to file a formal grievance with the grievance review officer after attempting to resolve the grievance informally. If the prisoner is not satisfied with the grievance officer's response, he may appeal to the chief administrative officer of the facility. If the prisoner is not satisfied with that response, the prisoner may appeal to the Commissioner of the Department of Corrections, whose decision is final. (*Id.* ¶ 117.) Under the policy, a grievance must be filed with the Grievance Review Officer within fifteen (15) days of the matter being grieved. (*Id.* ¶ 118.)

The Department of Corrections has a record of a first level grievance filed by Plaintiff on July 1, 2016, regarding a nurse and the dispensation of sunscreen. (*Id.* ¶ 120.) As part of the grievance process, Defendant Riebe provides the initial response to complaints regarding health care services. (*Id.* ¶ 122.) When she receives a grievance, she meets with the patient to investigate the complaint and to determine if the issue might be resolved. If the matter is resolved, Defendant Riebe discards the grievance and simply notes in a log book that the matter has been resolved. If the matter is not resolved, the grievance proceeds to the Grievance Correctional Officer. (*Id.* ¶ 124.) The Department has no records of any written initial grievances ("First Level Review") or written appeals to MCC's chief administrative officer ("Second Level Review") filed by Plaintiff, pursuant to Chapter 29.02 Client Grievance Rights: Prisoner Grievance Process, Medical and Mental Health Care, asserting a claim of retaliation against Defendant Riebe, involving Plaintiff's July 1, 2016, grievance. (*Id.* ¶ 121.) As part of her role in the grievance process, Defendant Riebe discussed with Plaintiff his grievance regarding the dispensation of sunscreen.

During the discussion, Plaintiff admitted the grievance involved another inmate. Defendant Riebe cautioned him against filing false statements. (*Id*. ¶¶ 130, 136.)

CCS receives no federal funding from the United States government, and is not a recipient of Medicare or Medicaid funds. (*Id*. ¶¶ 139-140.) CCS contracts with the United States government to provide health care services to certain federal prisons, and receives payment from the United States government pursuant to the contracts for services rendered. (*Id*. ¶ 141.) For its work in the State of Maine, however, CCS does not receive any money directly from the United States government because it does not provide any health care services to federal prisoners in Maine. (*Id*. ¶ 142.)

### 2. Summary Judgment Statement of the State Defendants

The following facts are established by Defendants Department of Corrections and Susan Carr through their Local Rule 56 summary judgment statement of material facts. (ECF No. 262.)

Plaintiff is incarcerated at the Maine Correctional Center (MCC), where he has complained frequently about hip and back pain, and made a number of requests for an additional mattress. (*Id*. ¶ 2.) The Department of Corrections has a policy that governs the property prisoners may keep in adult facilities, Policy 10.1, Prisoner Allowable Property. The policy includes a "Prisoner Allowable Property List" for Male Prisoners that specifies the personal property prisoners are allowed to possess. (*Id*. ¶ 3.) The Prisoner Allowable Property List provides that prisoners will be allowed one state-issued mattress. Policy 10.1 also specifies that medical items provided by the facility's health care department or purchased through special order or the facility's canteen service are allowable property.

(*Id.* ¶ 4.)  Unless possession of a specific medical item would create a risk to the security of the facility or the safety of prisoners or staff, the Department generally relies on the decisions and advice of its medical provider, CCS, as to whether provision of a particular item is medically necessary.  (*Id.* ¶ 5.)

MCC's warden, Scott Landry, and Defendant Carr have discussed with Defendant Robert Clinton, M.D., CCS's medical director, whether a second mattress is medically necessary for Plaintiff.  Dr. Clinton has advised that a second mattress is not medically necessary.  Based on this advice, Defendants denied Plaintiff's requests for a second mattress.  (*Id.* ¶ 8.)  There is no current security or safety concern regarding Plaintiff's possession of a second mattress.  (*Id.* ¶ 7.)

### 3.    Statements Offered by Plaintiff

Plaintiff filed a document titled "Plaintiff's Statement of Disputed Factual Issues." (ECF No. 342.)  In the document, Plaintiff admitted, denied, or qualified several of the statements offered by Defendants.[4]  Plaintiff, however, did not support his "statement" with record citations.  In essence, Plaintiff denied the Defendants' assertion that he does not suffer from a serious underlying condition because, in his view, Defendants have not conducted a thorough enough investigation to make an informed judgment.  (*Id.* ¶ 4.)

---

[4] Plaintiff filed an eleven-page summary judgment declaration, to which he attached over 100 pages of records.  (ECF Nos. 343, 343-1 through 343-7.)  The records attached to the declaration consist of Martin's Point Healthcare records pertaining to care received by Plaintiff in 2012 (ECF No. 343-1); records related to the referral to Dr. Piers (ECF No. 343-2); thirty-four pages of grievances (ECF Nos. 343-3, 343-4, 343-5, and 343-6); and the 2011 Final Report to the Government Oversight Committee from the Office of Program Evaluation & Government Accountability of the Maine State Legislature, titled "Health Care Services in State Correctional Facilities – Weaknesses Exist in MDOC's Monitoring of Contractor Compliance and Performance; New Administration is Undertaking Systemic Changes" (ECF No. 343-7).

Plaintiff maintains that in addition to trochanteric bursitis and ankylosing spondylitis, he suffers from eosinophilia and lymphadenopathy, which he describes as "unquestionably serious medical conditions and almost always indicative of a major health disorder." (*Id.* ¶ 26.)

In a declaration dated April 18, 2017, Plaintiff states in part "that [his] overall condition has the hallmarks of a possible malignant disease," based on "the medical opinion of a community physician who reviewed [his] medical history to try and help determine if anything has been missed." (ECF No. 366, ¶ 3.) He asserts that his lymphadenopathy and eosinophilia have a "likely correlation to [his] current constellation of symptoms." (*Id.* ¶ 4.)

In an August 3, 2015, report, Dr. Piers wrote: "Nick appears to have trochanteric bursitis bilaterally that may be related to the mattresses at the Correctional Center as Nick describes." (ECF No. 343-2, Ex. A at 3.) In his "discussion notes," Dr. Piers also wrote:

> I've recommended to the staff with him today to use a double-mattress technique – they do that oftentimes for patients – and maybe even an egg crate. He's not done well with 2 injections, on each side in the past, and I would not think about doing this today but would recommend PT to teach him how to perform core strengthening and stretch to the fascia lata and IT band. He may take oral AIs as provided by the infirmary.
>
> If he does poorly, and because of his history of steroid use for Crohn's, we would obtain an MRI to r/o osteonecrosis as a factor here.
>
> I'll see Nick back in a month to see how he responds to these simple conservative measures.

*Id.*

Citing some of the medical records, Plaintiff asserts that certain lymph node symptoms support the inference that his current symptoms are the product of the gradual progression of a serious underlying medical condition, such as non-Hodgkin lymphoma, chronic eosinophilic leukemia, myeloproliferative disorders, autoimmune disease or systemic infection. (Gladu Declaration ¶¶ 6 – 10.) Based on his review of medical reference material such as *Hematology in Clinical Practice* (5th ed.) and *Current Medical Diagnosis and Treatment* (2015), Plaintiff believes that adequate care requires that CCS conduct differential diagnostic testing to rule out these diseases.[5] (*Id.* ¶¶ 7 – 15.) Plaintiff contends that an MRI would also advance the differential diagnosis, and that an MRI is within the standard of care in accordance with Dr. Piers's recommendation. (Gladu Declaration ¶ 16.) Plaintiff asserts that the CCS staff have little interest in his complaints regarding medical care, have treated him as a nuisance, and that the alleged deficiencies in his care are, in part, retaliatory. (*Id.* ¶¶ 28, 31.)

More recently, Plaintiff appears to advance a different explanation for some of his symptoms and a different possible diagnosis. Based on blood work panels reported in 2009 (ECF No. 463-1), and a new declaration in which he provides a revised list of his symptoms (ECF No. 463-2), Plaintiff asserts that he believes he is suffering from Cushing Disease.

---

[5] Defendants contend Plaintiff is not qualified to offer testimony on the standard of care, and they assert through the supplemental declaration of Dr. Clinton that the symptoms are explained by Plaintiff's history of asthma and allergies. (Reply ¶¶ 7 – 15.)

# SUMMARY JUDGMENT ANALYSIS

## 1.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015).  If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim.  *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)).  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## 2.     CCS Defendants' Motion for Summary Judgment

### i.     *Deliberate indifference*

The CCS Defendants argue they are entitled to summary judgment on Plaintiff's deliberate indifference claim because the record does not establish that Plaintiff has an objectively serious condition, or that Defendants were deliberately indifferent to his medical needs.  (CCS Defendants' Motion for Summary Judgment at 2 – 6, ECF No. 266.)

Defendants' obligation to Plaintiff regarding medical services is governed by the Due Process Clause of the Fourteenth Amendment.  Specifically, the Due Process Clause imposes on the states the "substantive obligation" not to treat prisoners in their care in a manner that reflects "deliberate indifference" toward "a substantial risk of serious harm to health," *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011), or "serious medical needs," *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 161 (1st Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 – 106 (1976)).  To be actionable, a deliberate indifference claim must satisfy both an objective and a subjective standard.  *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011).

The objective standard evaluates the seriousness of the risk of harm to one's health.  For a medical condition to be objectively "serious," there must be "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'"  *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).  A medical need is serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention.  *Leavitt*, 645 F.3d

at 497; *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991).

The subjective standard concerns the culpability of the defendant. There must be evidence that a particular defendant possessed a culpable state of mind amounting to "deliberate indifference to an inmate's health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable." *Feeney*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)). The focus of the deliberate indifference analysis "is on what the jailers knew and what they did in response." *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002).

Deliberate indifference must be distinguished from negligence. As the First Circuit explained:

> A finding of deliberate indifference requires more than a showing of negligence. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987). A plaintiff claiming an eighth amendment violation with respect to an inmate's serious mental health or safety needs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference." *Estelle*, 429 U.S. at 106; *see also Cortes-Quinone v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.), *cert. denied*, 488 U.S. 823 (1988). Although this court has hesitated to find deliberate indifference to a serious need "[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment," *Sires*, 834 F.2d at 13, deliberate indifference may be found where the attention received is "so clearly inadequate as to amount to a refusal to provide essential care."

*Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991).

To the extent Plaintiff asserts a § 1983 deliberate indifference claim against an individual defendant, Plaintiff must introduce evidence to support a finding that the individual, through his or her individual actions, violated Plaintiff's constitutional rights. *Ashcroft v. Iqbal,* 556 U.S. 662, 676 – 77 (2009). The subjective component of the deliberate indifference claim requires a showing that a defendant had "actual knowledge of impending harm, easily preventable." *Feeney*, 464 F.3d at 162.

First, a review of the record fails to reveal an objectively serious, undiagnosed medical condition that poses a serious risk of harm to Plaintiff's health. That is, despite Plaintiff's concerns that he might suffer from a number of serious, potentially life-threatening diseases that have not been diagnosed, the record lacks any admissible evidence that would support such a finding.

In addition, the treatment of Plaintiff's complaints of pain and his diagnosed conditions does not constitute deliberate indifference, even if the conditions are objectively serious. Defendants' decision, after many examinations of and consultations with Plaintiff, not to order an MRI is not actionable. *Gamble*, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). Furthermore, Defendants' decision not to authorize a double mattress does not constitute deliberate indifference. The fact that the parties disagree as to the necessary treatment or that another medical provider might have recommended a type of treatment cannot, without more, establish deliberate indifference. A review of the medical record reveals that Defendants have been attentive to Plaintiff's many medical needs and have involved Plaintiff in the management of his medical needs. A fact finder simply could not

reasonably conclude that the attention paid to Plaintiff's medical condition was "so clearly inadequate as to amount to a refusal to provide essential care." *Torraco*, 923 F.2d at 234. The CCS Defendants are thus entitled to summary judgment on Plaintiff's deliberate indifference claim. [6]

## ii. *Disability discrimination*

The Court permitted Plaintiff to amend his complaint to assert claims under the Rehabilitation Act and Title III of the Americans with Disabilities Act, and analogous claims under the Maine Human Rights Act. (ECF Nos. 216 (Recommended Decision), 236 (Order).) The CCS Defendants argue that their treatment of prisoners' medical needs is not subject to scrutiny under the ADA or the Rehabilitation Act because prisons are not places of public accommodation for purposes of Title III and because CCS is not a recipient of federal funding for purposes of the Rehabilitation Act. (CCS Defendants' Motion for Summary Judgment at 11 – 13, 16 – 17.) The CCS Defendants also contend they are entitled to summary judgment because Plaintiff is not disabled and because the record does not support a finding of discrimination.

As explained in the Recommended Decision on Plaintiff's motion to amend:

> Disability discrimination can consist of (a) the imposition of adverse consequences on a prisoner based on the prisoner's disability, (b) a prison policy that is neutral in its terms, but impacts prisoners with a disability more significantly, or (c) the refusal by the prison administrators to grant the

---

[6] Plaintiff's federal claim under § 1983 and his state claim under the Maine Civil Rights Act are subject to the same merits-based analysis. *Clifford v. MaineGeneral Med. Ctr.*, 2014 ME 60, 91 A.3d 567, 583 n.17. *See also Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 275 (D.Me. 2010) ("The MCRA, which provides a general remedy for violations of federal and state constitutional and statutory rights, is 'patterned' after Section 1983. As such, disposition of a claim under Section 1983 controls a claim brought under MCRA.") (citation omitted).

prisoner a reasonable accommodation so that the prisoner can have meaningful access to a prison program or service.

(Recommended Decision at 14, ECF No. 216, citing *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006)).  Additionally, the Recommended Decision noted:

> Mere allegations of medical negligence, however, are not sufficient to state a disability discrimination claim. *Kiman*, 451 F.3d at 284 (citing *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("a plaintiff's showing of medical unreasonableness [under the Rehabilitation Act] must be framed within some larger theory of disability discrimination")). "When the decision being challenged is 'simply a reasoned medical judgment with which the patient disagreed,' it is more appropriate for the patient to turn to 'state medical malpractice law, not [the ADA].'" *Id.* at 285 (quoting *Lesley*, 250 F.3d at 58).

(*Id.*)

Plaintiff was thus aware of the requirements for a disability discrimination claim. Plaintiff, however, has not challenged the legal or factual bases upon which the CCS Defendants rely to support their request for summary judgment.  Instead, Plaintiff has focused on his contention that the CCS Defendants failed to treat his conditions properly, which failure included the failure to perform necessary diagnostic procedures.  (Plaintiff's Brief in Response to Defendants' Motions for Summary Judgment, ECF No. 341, *passim*.) Plaintiff's arguments regarding the quality of the treatment do not support a disability discrimination claim.  Accordingly, summary judgment in favor of the CCS Defendants is warranted. [7]

---

[7] Plaintiff also pursues a claim under the Maine Human Rights Act.  *Scott v. Androscoggin Cty. Jail*, 2004 ME 143, ¶¶ 20, 31, 866 A.2d 88, 94, 96–97 (disability claim under the MHRA analyzed according to ADA precedent).

### iii. Retaliation

In his amended complaint, Plaintiff claimed that the refusal to issue Plaintiff a second mattress was based on Plaintiff's grievance activity and Plaintiff's filing of a complaint with the medical board. (ECF No. 157-1 ¶ 154.) Plaintiff also alleged that Defendant Riebe retaliated against him by writing him up for making false statements. (*Id.* ¶¶ 276 – 279.)

To support a claim of first amendment retaliation, an inmate must establish (1) that the inmate engaged in conduct protected by the First Amendment; (2) that the defendant took adverse action against the inmate because of the protected conduct; and (3) that the adverse action was more than de minimis, i.e., was sufficient to deter an inmate of ordinary firmness from exercising his or her first amendment rights. *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see also Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 82 (D. Me. 2013).

To the extent Plaintiff contends that the refusal to provide Plaintiff with a double mattress constitutes the requisite adverse action to support a retaliation claim, Plaintiff's argument fails. The record lacks any evidence that would support the conclusion that the refusal to provide a double mattress was retaliatory in any way. Rather, the undisputed record establishes that Dr. Clinton considered whether the double mattress was necessary, discussed the issue with Dr. Piers, and rationally concluded that it was not medically

necessary. Dr. Clinton explained the decision to Plaintiff, and Drs. Clinton and Stockwell undertook a number of measures to treat Plaintiff's condition.

To the extent Plaintiff maintains that Defendant Riebe retaliated against him when she cited him because he filed a grievance concerning a matter that did not involve him, Plaintiff's claim also fails. The filing of a prison grievance is considered protected conduct. *Hannon*, 645 F.3d at 48 ("The plaintiff, in filing his own grievances and legal actions, plainly engaged in protected activity."); *Hightower v. Vose*, 95 F.3d 1146 (Table), No. 95-2296, 1996 WL 516123, *1, 1996 U.S. App. LEXIS 24041, at *3 – 4 (1st Cir. Sept. 12, 1996). Nevertheless, to be protected under the First Amendment, a grievance must not be frivolous. *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000); *Lewis v. Guillot*, 583 F. App'x 332, 333 (5th Cir. 2014).

On this record, Plaintiff's grievance regarding Defendant Riebe's "write up" of Plaintiff can fairly be characterized as frivolous. More importantly, given that the disciplinary proceeding regarding the "write up" was dismissed without any sanction imposed, the alleged retaliatory conduct (i.e., the "write up") did not result in a materially adverse consequence for Plaintiff. Defendant Riebe is thus entitled to summary judgment on the retaliation claim.[8]

---

[8] Defendant Riebe also argues that Plaintiff's retaliation claim against her is barred by Plaintiff's failure to exhaust the claim administratively. (CCS Defendants' Motion for Summary Judgment at 7 – 8.) As is reflected in the recitation of the background facts, the CCS Defendants have provided a record that substantiates the defense, providing an additional ground for summary judgment in favor of Defendant Riebe.

### iv. *Malpractice and breach of contract*

As discussed in the Recommended Decision on Plaintiff's motion to amend, Plaintiff's malpractice claim in this Court is limited to a claim against CCS; the individual defendants are not subject to the claim because Plaintiff did not proceed against them in his state court medical malpractice screening panel proceedings. (Recommended Decision at 10, ECF No. 216.) Plaintiff's pleadings also include the claim that CCS is liable to him for breach of a contract of which he is a third party beneficiary. (*Id.* at 17 – 18.) The malpractice and breach of contract claims are considered together because Plaintiff cannot succeed on a third-party beneficiary claim for breach of a contract to provide medical services to prisoners if he cannot establish that Defendants breached the standard of care.[9]

The CCS Defendants argue they are entitled to summary judgment because Plaintiff has not introduced evidence of breach of a CCS Defendants' professional obligation, specifically expert evidence in support of the medical malpractice claim. (CCS Defendants' Motion at 19 – 20.)

> To prove medical malpractice under Maine law, the plaintiff bears the burden to establish: (1) the appropriate level of medical care; (2) the defendant's deviation from that recognized standard; and, (3) that the conduct in violation of that standard was the proximate cause of the plaintiff's injury. *Ouellette v. Mehalic*, 534 A.2d 1331, 1332 (Me.1988); *Dubois v. United States*, 324 F.Supp.2d 143, 148 (D.Me.2004); see also Jack H. Simmons, Donald N. Zillman & David D. Gregory, Maine Tort Law § 9.06 (2004 ed.) (Maine Tort

---

[9] As noted in the prior Recommended Decision on Plaintiff's motion to amend: "Third parties to contracts are strictly limited in their ability to maintain an action under contract law. A third party harmed by a breach may only sue for breach of contract if the contracting parties intended that the third party have an enforceable right." *Stull v. First Am. Title Ins. Co.*, 2000 ME 21, ¶ 17, 745 A.2d 975, 981. (Recommended Decision at 17.) This Recommended Decision should not be construed to recommend a finding that the contract between the Department and CCS expresses the intention to provide prisoners with enforceable contract rights. Because Plaintiff cannot demonstrate the appropriate standard of care, breach, and causation, the Court need not address the issue.

> Law).  Ordinarily, a "plaintiff can discharge this burden only through expert medical testimony...." *Cox v. Dela Cruz*, 406 A.2d 620, 622 (Me. 1979). There is an exception to the general rule requiring expert testimony, but it is only in cases "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge...."  *Patten v. Milam*, 480 A.2d 774, 778 (Me.1984) (citation omitted); Maine Tort Law § 9.06.

*Demmons v. Tritch*, 484 F. Supp. 2d 177, 179 – 80 (D. Me. 2007).

Plaintiff's claims, including his malpractice and breach of contract claim, regarding the quality of his medical treatment do not involve issues of standard of care, breach, and causation that are sufficiently obvious to fall within common knowledge.  Because Plaintiff has offered no expert evidence to support his claim of medical negligence, Plaintiff's negligence claim fails.  Furthermore, because Plaintiff's contract claim is based on the same alleged breach, Plaintiff's contract claim also fails.  CCS, therefore, is entitled to summary judgment on Plaintiff's state law malpractice and breach of contract claims.

### 3.    State Defendants' Motion for Summary Judgment

Plaintiff asserts claims of deliberate indifference and disability discrimination against the State Defendants (the Department of Corrections and Susan Carr). Plaintiff alleges that the Department and Defendant Carr approved, authorized, and ratified the conduct of the CCS Defendants in connection with Plaintiff's medical care.  Plaintiff also alleges that the Department's limitation on the number of mattresses is a form of disability discrimination as applied to him.

The record establishes that (a) the Department of Corrections' policy regarding mattresses permits the issuance of a second mattress when medically necessary, (b) the Department relied on the medical advice of Dr. Clinton that Plaintiff's condition does not

require the issuance of a second mattress, and (3) the State Defendants did not single out

Plaintiff for disparate treatment on the basis of a disability. On this record, Plaintiff cannot

prevail on a claim of deliberate indifference or disability discrimination against the State

Defendants. The State Defendants, therefore, are entitled to summary judgment.

## CONCLUSION

Based on the foregoing analysis, Plaintiff's Motion for the Court to Take Judicial

Notice (ECF No. 369), Plaintiff's Motion to Strike the Supplemental Declaration of Robert

Clinton, M.D. (ECF No. 376), and Plaintiff's Motion for Judicial Notice (ECF No. 471)

are denied; and Plaintiff's Motion for Consideration of New Evidence (ECF No. 462) and

Motion to Add New Evidence to the Record (ECF No. 463) are granted.[10] In addition, I

recommend the Court grant the CCS Defendants' Motion for Summary Judgment (ECF

No. 266), and grant the State Defendants' Motion for Summary Judgment (ECF No. 261).

## NOTICE

Any objection to the orders granting or denying motions shall be filed
in accordance with Federal Rule of Civil Procedure 72.

In addition, a party may file objections to those specified portions of
a magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum within
fourteen (14) days of being served with a copy thereof. A responsive
memorandum shall be filed within fourteen (14) days after the filing of the
objection.

---

[10] Because I have granted Plaintiff's motions for the Court to consider additional evidence, Plaintiff's
objection (ECF No. 503) to Exhibit A to Defendants' response to the motions is dismissed as moot.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 18th day of December, 2017.